**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Lawrence McHALE et al.,**
**Defendants-Appellants.**

**Nos. 73–1860, 73–1861.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1974.

Decided April 8, 1974.

Gerald M. Werksman, William J. Stevens, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Michael D. Groark, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and PELL and SPRECHER, Circuit Judges.

PER CURIAM.

Defendants Lawrence McHale, James Traub, Chester Labiak, Daniel Vuletich, Henry Krauth, Sr., and August Krauth were indicted with three other persons not named as defendants for conducting an illegal gambling operation in violation of Illinois law and hence in violation of 18 U.S.C. § 1955. McHale, Traub and Labiak were convicted by a jury. Traub was placed on probation for 3 years and fined $1,500; Labiak was placed on probation for 2 years and fined $1,500; and McHale was placed on probation for 3 years.

On appeal the defendants contended (1) the wiretap order was tainted by information obtained through another wiretap declared illegal by this court; (2) the government failed to follow statutory authorization procedures in obtaining the wiretap order and the evidence obtained thereby; (3) the application for the wiretap order did not establish probable cause; and (4) the defendants did not conduct a 5-or-more persons gambling operation.

1. *Prior illegal wiretap.* In United States v. Roberts, 477 F.2d 57 (7th Cir. 1973), we held (a) that the content of communications intercepted on the telephone of Charles Bishop Smith was properly suppressed because neither the Attorney General nor any Assistant Attorney General specially designated by him authorized the wiretap applications and (b) that wiretap evidence directed against defendants "overheard on the property suppressed *Smith* wiretaps" was also properly suppressed.

The argument in the present case sought to extend *Roberts* a step farther inasmuch as none of the present defendants was overheard on the *Smith* wiretaps. Instead, the affidavit supporting the application for the wiretap recited in 3 of its 43 numbered paragraphs that Smith's telephone had been tapped (par. 16), that through that tap it was learned that Smith and Leonard Turner exchanged 12 telephone calls with Robert Hayden Plummer (par. 17) and that in those 12 calls "line" information was exchanged and wagers or lay off "moves" were made. The affidavit further recited that through telephone company records it was determined (par. 13) that Dennis Michael Finn, one of the alleged participants not named as a defendant here, had made calls to Plummer. The telephone company records were obtained by an F.B.I. agent *prior* to the receipt of the information of the Smith-Plummer calls in the illegal wiretap (par. 13) and as the result of a tip re-

ceived from an informant who had observed a Chicago bookmaker call telephone numbers used by Dennis Michael Finn and overheard the bookmaker exchanging line information and placing lay-off wagers.

The information from an informant that a known bookmaker called Finn's number and exchanged line information and made lay-off wagers did tend to show that Finn and the defendants (as shown through the untainted paragraphs of the affidavit) were possibly involved in a gambling operation.

18 U.S.C. § 2515 provides in part that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence *derived* therefrom may be received in evidence. . . ." (emphasis added). We held in *Roberts* that it was "no unusual extension of the scope of suppression under existing law to conclude that the wiretap evidence" obtained through overhearing the defendants on the illegal *Smith* wiretap was "derived" from that tap. In *Roberts* the prior illegal wiretaps "prompted" the wiretaps which this court suppressed, 477 F.2d at 60.

■ Here, the information from the proper sources was obtained prior to the information from the illegal wiretaps. If the tainted three paragraphs had not been in the wiretap application, the wiretap order could have still issued. There was sufficient information to find probable cause based on the untainted proper sources listed in the application. We do not, therefore, conclude that the evidence gathered under this lawful wiretap order (for which there was probable cause) was "evidence derived" from an unlawful wiretap order. This is the same principle which is applied in reviewing the issuance of search warrants where there is a question of whether there was sufficient probable cause to issue a warrant in which both tainted and untainted sources are set forth in the application. Clay v. United States, 246 F.2d 298, 304 (5th Cir.),

cert. denied, 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957); Chin Kay v. United States, 311 F.2d 317, 321–322 (9th Cir. 1962); United States v. Sterling, 369 F.2d 799, 802 (3d Cir. 1966).

■ *2. Authorization for wiretaps.* John N. Mitchell filed his affidavit in this case to the effect that while he was the Attorney General of the United States he personally approved and initialed applications for the wiretaps eventually authorized. In *Roberts*, we held that authorizations were proper where the Attorney General personally approved the wiretap applications, as here.

■ *3. Probable cause for issuance of wiretap orders.* The district judge who authorized the wiretaps found that there was probable cause to believe that Finn, Traub, Labiak, and others were committing offenses involving the operation of an illegal gambling business in violation of 18 U.S.C. § 1955, that wire communications concerning those offenses would be obtained through interception and that the telephones tapped were being used in connection with the commission of those offenses. The defendants argued that the affidavit supporting the application for the taps did not establish the reliability of the informers or the accuracy of the information. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

The supporting affidavit relied upon eight confidential sources, telephone company records, law enforcement records and surveillance by F.B.I. agents. The reliability of source 1 was based on information given on 15 previous occasions resulting in 33 successful gambling raids and 41 arrests; source 2 had provided information on a regular basis over a 6-year period resulting in the issuance of 5 search warrants and the arrest of 10 persons on local gambling charges; source 3 had furnished information resulting in the issuance of 3 search warrants and the arrest of 3 persons on local gambling charges; source 4 had furnished gambling information during the past three months

which had been determined to be accurate by independent investigation by the F.B.I.; source 5 had furnished information resulting in the issuance of 4 local search warrants, 4 local gambling raids; and the arrest of 4 persons on gambling charges; source 6 had furnished information resulting in 6 local gambling raids in which 50 persons were arrested and charged with gambling violations; source 7 had furnished information about 2 bookmaking operations that were handling bets on sports events and horse races, resulting in the issuance of 2 local search warrants and 3 arrests for gambling offenses; and source 8 had furnished information which resulted in 5 raids and the arrests of 7 persons on local gambling charges.

In addition most of the information obtained from the 8 informants was based on their own personal knowledge and not upon hearsay. Finally, the information in the affidavit included documentation from records. The reliability of the informants and of the information received from them appeared to be well established and it strongly supported the issuing judge's findings of probable cause.

*4. Conducting a 5-or-more persons gambling operation.* 18 U.S.C. § 1955 applies to "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business" which "involves five or more persons." The section "does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet." 1970 U.S.Code Cong. and Admin.News, p. 4029. Defendant McHale contended that he was a "lay off" bettor and although bets of this kind are made between bookmakers, he was not "conducting" a gambling operation nor was he part of a 5-man business.

The only exclusions intended by Congress were the individual player or bettor and not the professional bookmaker who also in the course of his business bets.

"Thus Congress' intent was to include all those who participate in the opera-

tion of a gambling business, regardless [of] how minor their roles and whether or not they [are] labelled agents, runners, independent contractors or the like, and to exclude only customers of the business." United States v. Becker, 461 F.2d 230, 232 (2d Cir. 1972). "As the House Committee Report stated, the term 'conducts' is broad enough to include both 'high level bosses and street level employees.'" United States v. Hunter, 478 F.2d 1019, 1022 (7th Cir. 1973) (includes runners, telephone clerks, salesmen and a watchman as "conducting" a gambling operation).

Certainly the lay off-bettor is a more obvious target of § 1955 than runners, salesmen, clerks, and watchmen.

We affirm the convictions of the defendants.

Affirmed.